B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>ZB, N.A. d/b/a CALIFORNIA<br>BANK & TRUST | DEFENDANTS<br>OUSAMA WAFAA KARAWIA and MAGGY DEEK<br>KARAWIA |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>BUCHALTER, a Professional Corporation<br>1000 Wilshire Bouelvard, 15th Floor<br>Los Angeles, California 90012  \|  Tel:  (213) 891-5109 | **ATTORNEYS** (If Known) |

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☒ Creditor
- ☐ Other
- ☐ Trustee

**PARTY** (Check One Box Only)
- ☒ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☐ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(I) Objection to Discharge Pursuant to 11 U.S.C. § 727 and (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 70 01( 1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/propert y - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 70 01 (2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001( 3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4 ) – Objection/ Revocation of Discharge**
- ☒ 41-Objection/re vocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 6 6 -Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 70 01(6) – Dischargeability (continued)**
- ☐ 61 -Dischargeability- §523(a)(5 ), domestic support
- ☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☒ 6 5 -Dischargeability - other

**FRBP 70 01(7) – Injunctive Relief**
- ☐ 71 -Injunctive relief- imposition of stay
- ☐ 72-Injunctive relief - other

**FRBP 70 01(8) Subordination of Claim or Interest**
- ☐ 81 -Subordination of claim or interest

**FRBP 70 01(9) Declaratory Judgment**
- ☐ 91 -Declaratory judgment

**FRBP 70 01(10) Deter mi nation of Remove d Act ion**
- ☐ 01 -Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | ☐ Demand $ 4,000,000.00 |

Other Relief Sought


American LegalNet, Inc.
www.FormsWorkFlow.com

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>OUSAMA WAFAA KARAWIA and MAGGY DEEK KARAWIA | BANKRUPTCY CASE NO.<br>2:18-bk-15201-VZ | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL DISTRICT OF CALIFORNIA | DIVISION OFFICE<br>LOS ANGELES | NAME OF JUDGE<br>Vincent Zurzolo |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Anthony J. Napolitano | | |
| DATE<br>August 3, 2018 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Anthony J. Napolitano | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.


American LegalNet, Inc.
www.FormsWorkFlow.com

1 | BARRY A. SMITH (State Bar No. 48697)
   bsmith@buchalter.com
2 | ANTHONY J. NAPOLITANO (State Bar No. 227691)
   anapolitano@buchalter.com
3 | BUCHALTER, A Professional Corporation
   1000 Wilshire Boulevard, Suite 1500
4 | Los Angeles, CA  90017-2457
   Telephone:    (213) 891-0700
5 | Facsimile:    (213) 896-0400

6 | Attorneys for Plaintiff
   ZB, N.A. d/b/a CALIFORNIA BANK & TRUST

7 |

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Case No. 2:18-bk-15201-VZ |
| OUSAMA WAFAA KARAWIA and MAGGY DEEK KARAWIA, | Chapter 7 |
| Debtor. | Adv. Proc. No. |
| ZB, N.A. d/b/a CALIFORNIA BANK & TRUST, | **COMPLAINT FOR:** |
| Plaintiff, | **(I) OBJECTION TO DISCHARGE PURSUANT TO 11 U.S.C. § 727; AND** |
| vs. | **(II) DETERMINATION OF NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523** |
| OUSAMA WAFAA KARAWIA and MAGGY DEEK KARAWIA, | |
| Defendants. | |

1    Plaintiff ZB, N.A. d/b/a California Bank & Trust (the "Plaintiff"), in accordance with Rule

2    7008(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") consents to entry

3    of final orders and final judgments of the United States Bankruptcy Court, Central District of

4    California (the "Bankruptcy Court"), and hereby complains and alleges as follows:

5    **I.**

6    **JURISDICTION AND VENUE**

7    1.    On May 4, 2018 (the "Petition Date"), Ousama Wafaa Karawia ("Sam Karawia")

8    and Maggy Deek Karawia ("Maggy Karawia") (collectively, the "Defendants") commenced their

9    chapter 7 bankruptcy case designated as *In re Karawia*, Case No. 2:18-bk-15201-VZ (the

10    "Bankruptcy Case") in the above-captioned Bankruptcy Court.

11    2.    This *Complaint for (I) Objection to Discharge Pursuant to 11 U.S.C. § 727; and

12    (II) Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523* (the "Complaint")

13    arises in the Defendants' Bankruptcy Case, and is brought pursuant to Rule 7001(a)(4) and (a)(6)

14    of the Bankruptcy Rules in accordance with the provisions of Part VII of the Bankruptcy Rules.

15    3.    This Complaint constitutes the initiation of an adversary proceeding arising under

16    11 U.S.C. §§ 523 and 727 of title 11 of the United States Code (the "Bankruptcy Code").  This

17    Bankruptcy Court has jurisdiction over this proceeding by reason of 28 U.S.C. § 1334(a) and (b);

18    28 U.S.C. § 157(a), (b)(2)(I), (b)(2)(J) and (c)(1); and General Order No. 266 of the United States

19    District Court for the Central District of California.

20    4.    Pursuant to 28 U.S.C. § 1409(a), this adversary proceeding is properly commenced

21    and prosecuted in this Bankruptcy Court in which the Defendants' Bankruptcy Case is pending.

22    **II.**

23    **PARTIES**

24    5.    Plaintiff ZB, N.A. is a national banking association, organized and existing under

25    and by virtue of the laws of the United States of America, is qualified to do business in

26    California.  On January 1, 2016, California Bank & Trust merged its banking charter into ZB,

27

28

2

**BUCHALTER**
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

N.A., and no longer exists as a separate California banking corporation.  As of January 1, 2016, ZB, N.A. is doing business as California Bank & Trust.

6.      On or about July 17, 2009, the Plaintiff acquired substantially all of the assets of Alliance Bank from the Federal Deposit Insurance Corporation (the "FDIC"), as receiver for Alliance Bank, which assets included the loans to the Defendants that are the subject of this Complaint.

7.      The Plaintiff is informed and believes and thereupon alleges that defendant, Sam Karawia, was, and is, an individual residing within the County of Los Angeles, State of California.

8.      The Plaintiff is informed and believes and thereupon alleges that defendant, Maggy Karawia, was, and is, an individual residing within the County of Los Angeles, State of California.

### III.

### FACTUAL BACKGROUND

**A.      The Defendants' Obligations Owing to the Plaintiff.**

9.      On November 26, 2008, the Defendants, as borrowers, executed and delivered to Alliance Bank, as lender, a written Promissory Note for the principal sum of $500,000.00 (the "First Note").

10.      On November 26, 2008, the Defendants, as borrowers, executed and delivered to Alliance Bank, as lender, a written Promissory Note for the principal sum of $1,000,000.00 (the "Second Note").

11.      The FDIC assigned to the Plaintiff on February 6, 2009, all of its right, title, and interest to certain assets of Alliance Bank including, without limitation, the First Note, the Second Note, and all related loan documents.

12.      The Defendants defaulted under the terms of the First Note including, without limitation, the Defendants' failure to pay the sums due and owing when the First Note matured on its own terms on October 28, 2009.

BN 33681044V2

3

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

13.    The Defendants defaulted under the terms of the Second Note including, without limitation, the Defendants' failure to pay the sums due and owing when the Second Note matured on its own terms on October 28, 2009.

14.    As a result of the Defendants' failure to cure the defaults under the First Note and the Second Note, on May 10, 2013, the Plaintiff filed its Complaint in the California Superior Court, County of Los Angeles, against the Defendants asserting claims for breach of contract, money lent and account stated.

15.    The filing of the Complaint commenced the state court action designated as *California Bank & Trust v. Karawia*, BC508592 (L.A. Sup. Ct. 2013) (the "State Court Action").

16.    On October 17, 2014, the jury found in favor of the Plaintiff and against the Defendants.

17.    On November 19, 2014, the Superior Court entered its *Judgment After Trial* awarding the Plaintiff $2,490,869.14 in damages, plus attorneys' fees of $349,806.50 and costs of $12,173.05 for a total of $2,852.848.69 (the "Judgment").

**B.    The Defendants' Elaborate Scheme to Make Themselves Judgment Proof.**

18.    After more than forty months attempting to enforce its Judgment, the Plaintiff had completely exhausted its post-judgment remedies without having recovered one cent–all while the Defendants continue to live a lavish lifestyle in their Brentwood, Los Angeles mansion, located at 12678 Mountain Crest Lane, Los Angeles, California 90049 (the "Brentwood Mansion"), which has been valued at $10,750,000.00.

19.    During this time, the Plaintiff conducted at least three judgment debtor examinations of Sam Karawia, two of Maggy Karawia, and seven of third parties, subpoenas to multiple banks which have produced thousands of pages of records, and a wage garnishment order.  As a result of the examinations, the Plaintiff uncovered the Defendants' elaborate scheme.

1.    **The Defendants' Various Business Entities and their Overlapping DBAs.**

20.    During the course of the numerous judgment debtor examinations taken by the Plaintiff, and based on the Plaintiff's own investigations, it has been uncovered that the

Defendants have operated their scheme over the last few decades under no less than twenty-three businesses, including: (i) Karawia Industries, Inc.; (ii) Karawia International Investments, Inc.; (iii) Karawia International Investments, LLC; (iv) Dekar Industries, Inc.; (v) American Uniform & Equipment Co. [1]; (vi) E-Source Group, LLC; (vii) Nationwide Law Enforcement Academy, Inc.; (viii) PBM Facility Services; (ix) Professional Building Maintenance; (x) United Stevedoring; (xi) U.S. Resource Security and Investigation, Inc.; (xii) U.S. Resource Facility Services, Inc. (xiii) U.S. Resources Government Services, Inc., (xiv) U.S. Resource Services, Inc.; (xv) U.S. Resource Special Services, Inc.; (xvi) Vescom Corporation; (xvii) Worldwide Sourcing Solution, LLC; (xviii) Worldwide Sourcing Group, Inc.; (xix) Premier Fuel Distributors, Inc.; (xx) Centennial One of Washington, Inc.; (xxi) Centennial One of Washington Security, LLC; (xxii) I-Source Business, Inc.;, and (xxiii) Premier Fuel Distributors, Inc.

21.    Further, in reviewing fictitious business name statements filed in the County of Los Angeles, the Plaintiff found that the Defendants filed the following d/b/a statements: (i) Action Security and Investigation; (ii) Calabasas Security Corp.; (iii) Guardian Services; (iv) Guardian SVCS; (v) International Services Inc; (vi) Skyline Building Services; (vii) Tom Reading Security Services; and (vii) INT'L Svcs. Inc.

22.    In addition, Centennial One of Washington Inc. is also used as a d/b/a of American Uniform and Equipment Company, Inc., which in turn is a d/b/a of Nationwide Law Enforcement Academy.  Thus, if one entity is closed down, levied against, or seized, checks made payable to the defunct entity can be deposited in the account of its d/b/a.

23.    As detailed below, the flow of assets between the entities belonging to the Defendants, or d/b/a's thereof, establishes that the corporations formed by the Defendants are nothing more than shells under which the Defendants can hide assets.

---

[1]  The underlined entities have been utilized over the last two years by the Defendants' to avoid collection of the Plaintiff's Judgment.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

2. **Sam Karawia Receives Compensation through Corporate Shells in Order to Avoid Collection Efforts and Paying Taxes.**

24.    During his first judgment debtor examination, Sam Karawia testified that he received $17,000 per month as a consultant working for American Guard Services, Inc. ("AGS") and that this was his only source of income.

25.    Sam Karawia also testified that he was not paid directly by AGS but rather he received his income from his consulting company, I Source.  I Source was solely owned by Sam Karaiwa.

26.    Sam Karaiwa also testified that in addition to the $17,000 he received from I Source, he "borrowed" $29,400 per month in the form of a loan from I Source.

27.    On January 14, 2016, the Plaintiff caused AGS to be served with an Earnings Withholding Order requiring AGS to withhold the wages of the Sam Karaiwa.

28.    Further, the Plaintiff caused the Los Angeles County Sheriff to serve AGS with a Third Party Levy, levying on money due or becoming due to the Defendants.

29.    AGS never responded to the Earnings Withholding Order or the Third Party Levy.

30.    Upon becoming aware of the existence of I Source, the Plaintiff sought a turnover order compelling Sam Karaiwa to surrender all of his stock in I Source to Los Angeles County Sheriff for sale.  After a noticed sale, the Plaintiff purchased all the outstanding shares of I Source.

31.    At his subsequent debtor exam, Sam Karaiwa testified that he was no longer working for I Source, but rather was working for Centennial One of Washington and still providing consulting services for AGS.

32.    Sam Karaiwa further testified that he was still receiving between $16,000 to $18,500 per month in salary for his consulting work—plus the monthly "loans."

33.    Centennial One of Washington was a corporation owned entirely by Maggy Karawia.  Upon discovering the existence and role of Centennial One of Washington, the Plaintiff obtained a turnover order compelling Maggy Karawia to surrender her shares in Centennial One

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

of Washington to the Los Angeles County Sheriff for sale. At the ensuing stock sale, the Plaintiff purchased all of Maggy Karawia's shares in Centennial One of Washington.

34. On November 16, 2015 and January 22, 2016, the Plaintiff took the examination of the person most knowledgeable at AGS regarding its relationship with Sam Karaiwa. The person most knowledgeable at AGS turned out to be Sam Karaiwa's ex-wife, Sherine Assal.

35. Ms. Assal testified that Sam Karaiwa was not making $18,500 per month from AGS but rather was being paid $18,000 *per week*. Further, AGS produced documents memorializing all payments made to Sam Karaiwa by AGS from October 2014 through October 2015.

36. Finally, Ms. Assal confirmed that Sam Karaiwa was still consulting at AGS, but that he was no longer being paid through I Source but rather through Centennial One of Washington. Shortly after the examination of Ms. Assal, the Plaintiff propounded another wage garnishment and an account debtor levy on AGS.

37. Both Sam Karaiwa and Ms. Assal assert that Sam Karaiwa is merely a consultant for AGS and has no ownership interest in the company. It is therefore not surprising that payments from AGS were made into Sam Karaiwa's various bank accounts—albeit in shockingly high amounts. It is surprising, however, that a review of the bank records of I Source and American Uniform and Equipment (another company owned by Sam Karaiwa) show that payments were made from these entities to Ms. Assal, S&S Entities (the parent company of AGS), and Professional Builders Maintenance (an affiliate of AGS) in the amount of $592,200 between February 6, 2014 and January 29, 2015. These payments call into question the veracity of the assertions that Sam Karaiwa has no ownership interest in AGS or its affiliates.

38. At the January 29, 2016 judgment debtor examination, Sam Karaiwa testified that he was no longer being paid for his consulting at AGS although he was still working at the company. When asked how he was being compensated for his time, Sam Karaiwa testified that he was working off days that he had missed in the previous year and was not being paid.

7

**COMPLAINT**

39.     When asked how he was paying his bills, Sam Karaiwa responded that he was borrowing money from his son.  Coincidentally Sam Karaiwa's son is now employed at AGS.

40.     Finally, with respect to the monthly "loans" made to Sam Karaiwa by I Source and Centennial One, a review of the corporate minutes, which came into the possession of the Plaintiff when it purchased the all stock of the two companies, evidence that the companies purportedly forgive any obligation Sam Karaiwa supposedly owed on the "loans" and went so far as to state "the corporation will not issue any write off, 1098, 1099C, 1099 or any other IRS forms to Ousama Karawia."

41.     Essentially, in lieu of salary, the companies "loan" money to Sam Karaiwa, which loans are then "forgiven" without any reporting to the federal or state tax agencies so that Sam Karawia avoids any tax consequences.

### 3.     The Defendants' Corporate Shell Games and Financial Merry-Go-Round Between the Defendants' Linked Bank Accounts.

42.     After the time that the Judgment was entered, the Defendants have operated through (at least) three corporate entities, I Source, Centennial One of Washington, and Nationwide Law-Enforcement Academy d/b/a American Uniform & Equipment Co.

43.     In November 2015, Maggy Karawia testified that the Defendants maintained bank accounts at Union Bank.  Immediately upon obtaining this information, the Plaintiff propounded a document request to Union Bank for all information relating to accounts held in the names of the Defendants or under Social Security numbers issued to the Defendants.

44.     The documents reviewed were provided by Union Bank and consisted of over 6,000 pages of bank records and contained more than 11,000 separate transactions.  The records and transactions are limited to the time period of January 2015 through October 2015 containing the account information for I Source, Centennial One of Washington, National Law Enforcement and the Defendants' personal accounts from January 2015 to October 31, 2015 ("the 10-Month Window").

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

45.     Not surprisingly, the Defendants closed the aforementioned accounts and transferred all the money out of those accounts immediately after the judgment debtor exam in which the accounts were identified.

46.     Between January 1, 2015 and November 10, 2015, the Defendants transferred over $671,000 between the accounts belonging to I Source, Centennial One of Washington, National Law-Enforcement Academy, and the Defendants' personal account—usually in increments less than $10,000; some in cash, some in cashier's checks.

47.     The Defendants could not recall the purpose for any specific withdrawal of check—including the check made payable to Sam Waffa—an alias used by Sam Karawia.

48.     Funds from the I Source account were used to pay the mortgage and the utility bills for the Brentwood Mansion.  Further, over $40,000 was transferred in small increments to the Defendants' personal account to pay personal expenses.

49.     The following chart is part of this Paragraph.



**COMPLAINT**

50.     With respect to Centennial One of Washington, a company which Maggy Karawia had testified was no longer in operation, during the 10-Month Window Centennial One of Washington made over $100,000 in payments to Oasis Outsourcing, $194,000 to American Express, transferred more than $47,000 to the Defendants' personal account, and drew more than $38,000 in cash or cashier's checks.

51.     Interestingly, there was also a check drawn on this account to pay an individual by the name of "Sam Wafaa," an alias used, by Sam Karawia.   The check shows that it was deposited with City National Bank, however City National Bank has no record of any accounts belonging to the Defendants, or anyone utilizing the Defendants' Social Security numbers.

52.     Thus, it appears that Sam Wafaa, a.k.a. Sam Karawia has a bank account at City National Bank under a Social Security number different than the Social Security number issued to Sam Karawia.

53.     The following chart is part of this Paragraph.



54.     The Union Bank account belonging to National Law Enforcement Academy is particularly intriguing.  When the Nationwide Law Enforcement Academy was in operation, it sold fire arms to security guards and law enforcement personnel.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

55.     Following Sam Karawia's conviction for fraud and on weapons charges, National Law-Enforcement Academy was suspended.   According to Sam Karawia, National Law Enforcement Academy has not conducted any business since 2009.

56.     Strangely, the account belonging to this suspended corporation shows more than $303,553 in insurance payments during the 10-Month Window to Lincoln Benefit, Prudential, MetLife, Transamerica, and National Life.  Sam Karawia had offered no explanation with respect to these insurance payments.

57.     The following chart is part of this Paragraph.



58.     With respect to the Defendants' income, Sam Karawia insisted that he was only paid $18,000 per month for his work at AGS and that he and his wife have no other source of income.

59.     A review of the deposits made into the Union Bank accounts show that during the 10-Month Window, I Source received $209,000 in payments from American Guard Services, Centennial One of Washington received $349,500 from AGS, and National Law Enforcement Academy received $180,000 in payments from AGS.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

60.    Documents produced by AGS show that rather than $209,000 in payments to I Source, AGS paid I Source $508,000 during the same period.  There is no explanation for the $299,000 difference between the records produced by Union Bank and the records produced by AGS.

61.    In addition to the $1,037,500 received by the Defendants from AGS, the Defendants received $97,200 in payments from S&S Management (the parent company of AGS) and $159,000 from an entity called Union Station.

62.    In total, for the 10-Month Window memorialized in the Union Bank records, the Defendants received more than $1,290,000 in income, paid more than $120,000 in mortgage payments, paid more than $330,000 in insurance payments, paid American Express over $200,000, paid more than $25,000 in private school tuition . . . and paid the Plaintiff $0.00.

4.    **The Defendants' Home Furnishing and Personal Property Scam.**

63.    On September 17, 2015 the Superior Court in the State Court Action ordered the Defendants to turn over all personal property and furniture to the levying officer.

64.    The Defendants initially opposed the Plaintiff's request for a turnover order by arguing that the furniture in the Defendants' home had been pledged as collateral for $40,000 loan from Sam Karawia's two adult daughters.  The pledge of the collateral was purportedly supported by a UCC-1 Financing Statement which expired in 2015 prior to the levy.

65.    When this argument failed to persuade the Superior Court, the Defendants argued that their two minor children would have no place to sleep.  The Plaintiff agreed to exclude the "children's furniture" from the levy.

66.    Thereafter, the Superior Court issued its *Turnover and Seizure Order in Aid of Execution and Order Enjoining Interference with Turnover of Property* (the "Turnover Order") that excluded only "children's furniture."  The Defendants failed to comply with the Turnover Order.

67.    On four separate occasions, deputies from the Los Angeles County Sheriff's Department went to the Defendants' residence to arrange the turnover of the Defendants' furniture.  On all four occasions, the Debtors did not answer the door.

68.    Finally, the Defendants' counsel informed the Plaintiff that all of the Defendants' furniture had been sold to the Defendants' children.  According to the Defendants, the furniture was beyond the reach of the Turnover Order because it is now all "children's furniture."

69.    In addition, the Defendants were ordered to turn over all art and jewelry to the levying officer.  To date, no art had been turned over and only few pieces of costume jewelry have been turned over to the levying officer.

70.    When asked if the Defendants owned any jewelry, the Defendants both testified that they were in possession of no jewelry of any worth.  When presented with photographs of his wife wearing extensive jewelry at public function, Sam Karawia testified that the jewelry was on loan from the jewelry store.

71.    Documents obtained from Van Cleef and Arpels, and De Beers Diamond Jewelers, high-end Beverly Hills jeweler, establish that the Defendants purchased approximately $168,823 worth of fine jewelry from these jewelers between 2001 and 2015.  The description of the jewelry in the sales receipt describe the piece of jewelry supposedly on loan from the stores.

72.    When asked what happened to this jewelry, Maggy Karawia testified that she gave it to her husband.  When confronted with these sales receipts and Maggy Karawia's testimony, Sam Karawia testified that he had sold the jewelry for cash in downtown Los Angeles, but he could not produce a sales receipt and could not remember to whom he had made the sale.

73.    California Business and Professions Code Section 21625 *et seq.* requires a business purchasing second hand jewelry to provide a written receipt to the seller and report to the transaction to the California Department of Justice.  Sam Karawia's convenient memory lapse with respect to the identity of the purchaser or purchases prevents the Plaintiff from being able to confirm or refute the alleged sale.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

5.      **The Defendants have Attempted to Shield their Brentwood Mansion with "Friendly Liens."**

74.     Once the Judgment was entered, the Plaintiff recorded a judgment lien against the Defendants' Brentwood Mansion.  A review of the liens recorded against the Brentwood Mansion conducted in July 2015 revealed that the property was encumbered in the amount of $15,606,547 and the property had an estimated appraised value of $10,750,000.

75.     An investigation into the recorded liens, however, revealed that several of the liens were held by defunct companies or individuals who could not be located and were perhaps fictitious.  While the Plaintiff's ability to clear defective liens on the Brentwood Mansion was severely limited by its ability to obtain information from these third parties, the Plaintiff had been able to identify $3,144,823 worth of liens that are ineffective, satisfied, or otherwise expired.

76.     The Plaintiff had exhausted its ability to investigate the validity of the remaining liens and received no cooperation from the Defendants despite its numerous requests that the Defendants provide the Plaintiff with the current status of various outstanding loans, judgment liens, and tax liens.

6.      **Sam Karawia Continues to Misrepresent his Assets and Sources of Income.**

77.     On June 29, 2015, the Superior Court ordered Sam Karawia to turn over to the levying officer all stock certificates and shares of I Source—extinguishing his ownership interest in the company.  Further, as detailed above, as of July 1, 2015, AGS was directing all payment for Sam Karawia's consulting to Centennial One of Washington and not I Source.  As reflected in the Union Bank documents, as July 1, 2015, I Source had no income.

78.     Despite the foregoing, on August 13, 2015, Sam Karawia submitted to Capital One a profit and loss statement for I Source and a cover letter in which Sam Karawia states that he is employed by I Source and is the sole contractor of I Source.  Pursuant to 18 U.S.C. § 1014, it is unlawful for any person to knowingly make false statements on any loan application submitted to an institution insured by the Federal Deposit Issuance Corporation.

79.    Finally, on June 30, 2015, Larry Finley, a former business associate of Sam Karawia , filed a complaint in Los Angeles County Superior Court asserting claims against Sam Karawia and Premier Fuel Distribution, Inc. ("Premier Fuel") for wrongful termination in violation of public policy, and retaliation under California Labor Code Section 1102.5.

80.    Aroused by Mr. Finley allegations, the Plaintiff conducted an investigation into Premier Fuel and on December 21, 2015, the Plaintiff conducted a third party examination of the person most knowledge at Premier Fuel.

81.    A review of Premier Fuel's bank records reveal Sam Karawia is an authorized signatory on Premier Fuel's corporate banks account.  Further, the Defendants' bank records show that Premier Fuel received a cash infusion of $100,000 from the Defendants' private account.

**C.    The Plaintiff Obtains the Appointment of a Post-Judgment Receiver.**

82.    Due to the repeated efforts of the Defendants to render themselves judgment-proof, the Plaintiff sought and obtained the appointment of a post-judgment receiver over the assets of the Defendants.

83.    On May 3, 2017, the Superior Court entered its *Order Appointing Post-Judgment Receiver Over Assets of Judgment Debtors Ousama Karawia aka Sam Karawia and Maggy D. Karawia and to Enforce Money Judgment and Preliminary Injunction in Aid Thereof* in the State Court Action (the "Receivership Order").

84.    The Receivership Order appointed and authorized the Receiver to enforce the Judgment and to take possession of the "Receivership Property" and to collect all income, revenue and profits of such property and to distribute the proceeds to the Plaintiff in satisfaction of the Judgment.

85.    The Receivership Property included, among other things, any and all of the Defendants' income, revenue and profits, and proceeds therefrom, and all assets directly or indirectly owned or controlled by the Defendants, or which is being held or controlled by another for the benefit of the Defendants.

1.    **The Receiver Uncovers Five Undisclosed Life Insurance Policies Owned by the Defendants that have Residual Value.**

86.    The Plaintiff previously identified that the Defendants were paying Lincoln Benefit, Prudential, Metlife, Transamarica, and National Life the sum of $27,595.72 per month. What was troubling about these payments was that they were being made through a bank account of a closed entity owned by the Defendants, National Law-Enforcement Academy, and the Defendants had provided no explanation what the payments were for.

87.    Notwithstanding four (4) judgment debtor examinations of Sam Karawia and two (2) for Maggie Karawia, the Defendants repeatedly stated that they had no idea what these payments were for, and failed to produce any documents pertaining to these payments notwithstanding multiple subpoenas requiring them to do so.

88.    Following the appointment of the Receiver, the Receiver was able to divert the Defendants' mail to the Receiver's attention so that the Receiver could ascertain whether the Defendants had any undisclosed assets or sources of income.

89.    The Receiver was able to identify five third-party insured life insurance policies (the "Policies") which are owned by the Karawia Revocable Living Trust Dated July 9, 1998 (the "Karawia Trust") but for which the Defendants have disavowed owning any interest.

90.    Yet, following the Receiver's appointment, and notwithstanding the express prohibitions in the Receivership Order, Sam Karawia has repeatedly attempted to transfer ownership of the Policies to an affiliated entity.

91.    Specifically, Sam Karawia attempted to change the ownership of three of the Lincoln Benefit Policies to Financing Debt, LLC on July 3, 2017, which was two months after the Receiver was appointed in direct violation of the Receivership Order.

92.    However, because the insurance companies had been notified of the Receiver's appointment and because Sam Karawia's efforts to transfer the policies were not properly done, Lincoln Benefits rejected the transfer attempt, and notified the Receiver that the receivership estate was the designated owner of the those policies pursuant to the Receivership Order.

**COMPLAINT**

93.     The forms provided by Lincoln Benefits, which are signed by Sam Karawia, identify that as of July 3, 2017, the owner of those particular policies was the Karawia Trust.

94.     Similarly, on June 7, 2017, one month after the Receiver's appointment, Sam Karawia attempted to change the address for the Brighthouse policy to 3581 Santo Thomas Cl, Corona, California 92882, which appears to be the address of Wael Mudawar, the purported managing member of Financing Debt, LLC, and the mailing address for the Brighthouse Policy also to Financing Debt, LLC, in direct violation of the Receivership Order.

95.     The Defendants have not made any payments on these Policies since at least June 2017 and the monthly premiums total over $27,000 per month.  Each of the insurance companies have stated that the Policies will lapse if the payments in arrears are not immediately remedied.

96.     As a result of the discovery of the Policies and the Defendants attempt to transfers certain of the policies to a third party entity, the Receiver sought and obtained an *Order (1) Authorizing the Receiver to Engage a Broker and to Market and Sell Life Insurance Policies of Third Party Insureds Owned by the Karawia Revocable Living Trust*, which was entered on October 10, 2017 by the Superior Court in the State Court Action.

97.     As a result, the Receiver has been authorized to retain Meville Capital to market and sell the Polices.  Following entry of the order, Melville Capital undertook efforts to market and sell the Policies.

98.     During Melville Capital's and the Receiver's efforts to sell the Policies, the Receiver was informed that certain of the Policies likely lapsed due to non-payment of the premiums, although there was a possibility (although no guaranty) that they could be revived if a third party was willing to promptly; pay sufficient sums to revive.

99.     At this point, the Receiver believes that only one of the policies, the Reger Prudential Policy No. XXX434, may still have value.  Despite initially receiving a written offer to purchase this policy, the would-be third party purchaser terminated the purchase because it believed the paperwork tied to the creation of that policy did not pass its due diligence requirements.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

## 2.    The Furniture Debacle.

100.    Prior to the appointment of the Receiver, the Superior Court in the State Court Action entered its Turnover Order.  In February 2018, the Defendants and their children arranged for a moving van to come to the Brentwood Mansion apparently in an effort to remove surreptitiously the furniture that is subject to the Turnover Order.

101.    Their plot was foiled by the Receiver's investigators who had the house under surveillance.  In connection with proceedings before the Superior Court, the Plaintiff and the Receiver agreed that furniture belonging to the Defendants' minor children would not be subject to the Receivership Order or the Turnover Order.

102.    On March 26, 2018, the Receiver, his associate Gus Raya, the Receiver's liquidator, Will Munyon, and movers he retained, arrived at the Defendants' Brentwood Mansion to gain access to the home and take possession of all the personal property (other than the children's furniture and clothing) located therein as authorized under the Turnover Order and the Receivership Order.

103.    Present at the home was Howard Cahmi, counsel for the Defendants, and John Whelan, counsel for the Defendants' children.  Upon entry, it was discovered that the vast majority of the furniture had been tagged with labels claiming that those assets belonged to the children, and therefor were allegedly not part of the receivership estate.

104.    In an effort to execute the terms of the Receivership Order, the Receiver contacted the Los Angeles Police Department, who sent two deputies.  Although the LAPD provided no direct orders to anyone involved, they did take the position that although this was clearly a civil matter, it did not appear that either Messrs. Cahmi or Whelan had any Court documents that superseded the Receivership Order.  The furniture from the house was carefully photographed, inventoried, packed and moved (collectively, the "Furniture").

105.    The Receiver was careful to respect the agreement that the children's furniture would not be removed.  Counsel for the Defendants and the Receiver toured each bedroom, and

**BUCHALTER**
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

1    despite those rooms containing furniture that appeared to have value, all four of those rooms were

2    left undisturbed as they were alleged to include furniture of the Defendants' children.

3        106.    Additionally, the Receiver left every single item in the kitchen, the kitchen table,

4    its chairs and an ornate lamp hanging over the kitchen table.  Nothing was removed from the

5    kitchen or any of the bathrooms in the house.

6        107.    As part of this furniture debacle, two of the Defendants' children, Pamela Karawia

7    and Crystal Karawia, filed a declaratory relief action, designated as *Karawia v. California Bank*

8    *& Trust*, Case No. BC695125 in the Superior Court, seeking a determination that they and their

9    minor siblings are the rightful owners of the Defendants' personal property located at the

10   Brentwood Manson.

11       108.    In that action, the Defendants and their children have taken the position that all of

12   the personal property located at the Brentwood Mansion and taken from the Brentwood Mansion

13   by the Receiver are not property of the Defendants, but are property of the Defendants' children.

14           **3.    The Defendants Launder Money through the Account of their Son.**

15       109.    In early December 2017, the Receiver obtained records from Capital One Bank,

16   including an "Account Information Sheet," which listed the source of payments made by the

17   Defendants on the loan secured by their personal residence to Capital One.

18       110.    Based on the information set forth on the Account Information Sheet, the Receiver

19   obtained from Bank of America account records for Special Resource Inc. ("SRI"), which was a

20   recent corporate shell utilized by the Defendants to hide their assets and income.

21       111.    One of the accounts from which the Defendants had paid their mortgage with

22   Capital One from March 2016 through April 2017 was Account No. XXXXXX9452 with Bank of

23   America under the name of SRI (the "Special Resource Account").

24       112.    In the State Court Action, the Receiver was able to freeze the Special Resource

25   Account because it was owned and controlled by the Defendants.  After the Special Resource

26   Account was frozen, Capital One Bank started to receive payment on account of the Defendants'

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

mortgage beginning in August 2017 from a Bank of America account designated as Account No. XXXXXX1195 (the "New Account").

113.    On December 20, 2017, Bank of America provided the Receiver with three months' worth of records for the New Account.  These records revealed that the New Account is in the name of the Defendants' son, Karim O. Karawia.

114.    A side-by-side comparison of the records for the Special Resource Account and the New Account show that the Defendants simply started using the New Account (held in the name of their son) to pay the same obligations of the Defendants that had been paid by the Special Resource Account.

115.    These similar expenditures include:  payment of the Defendants' mortgage, home warranty, Time Warner bills, Dish Network bills, American Express account, SoCal Gas bills, Allstate Insurance, Marc Labossiere (the Debtors' pool guy), Mountaingate's private property dues, and the Defendants' minor children's private school tuition.

116.    Furthermore, notwithstanding Karim Karawia's statement under penalty of perjury that the funds in the New Account are not held "for the benefit of the Defendants in this Action" and that the funds were only used for his "personal living expenses," the following payments were made solely for the benefit of the Defendants:

a.    The Defendants' IRS Tax Payment of $10,912.00 was paid from the New Account for the Defendants' IRS Taxes on October 17, 2017;

b.    The Defendants' FTB Tax Payment of $3,875.00 was paid from the New Account for Sam Karawia's benefit to the Franchise Tax Board on October 15, 2017;

c.    Sam Karawia's Nieman Marcus bill of $36.76 was paid by check to Nieman Marcus for the benefit of Sam Karawia by a check drafted by Sam Karawia;

d.    Allstate Car Insurance Payment for the Defendants' daughter in the amount of $593.07 was paid from the New Account to Allstate for Pamela Karawia's insurance; and

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

e.    Payment of the Defendants' minor children's private school tuition in the amount of $3,181.82 was paid from the New Account to Smart LLC, which is a private school tuition online payment platform.

117.    A comparison the payments made from the Special Resource Account and the New Account purportedly owed by the Defendants' son, Karim Karawia, show that the Defendants' bills are now being paid from the Bank of America account and that Karim Kawawia, who is approximately 27 years' old, is netting in excess of $55,000 per month (*i.e.*, $660,000/year).

118.    On January 11, 2018, the Superior Court ordered that funds held in a Bank of America account in the name of Karim Karawia be held by the Receiver in the receivership account at Wells Fargo, until further order of the Court.

119.    On February 12, 2018, $17,830.46 was deposited into the receivership account at Wells Fargo.  An appeal of the order directing the Receiver to deposit those funds was filed by Karim Karawia, which was denied on March 29, 2018.  The Superior Court held that Karim Karawia did not have a valid third-party claim to those funds and that those funds could be used to pay receivership expenses.

**D.    The Defendants' Commence their Chapter 7 Bankruptcy Case and Disclose that They Earn Zero Income and Have Only $2,500 in Assets!**

120.    On the Petition Date, the Defendants commenced the above-captioned bankruptcy case by filing their Voluntary Petition for relief under chapter 7 of the Bankruptcy Code.

121.    In their *Statement of Financial Affairs*, the Defendants disclose that Sam Karawia earned income of $416,000.00 for 2016 and income of $280,000.00 for 2017.  Yet, on *Schedule I: Your Income*, the Defendants disclose that Sam Karawia, while employed by Special Resources, Inc., earns no income at all.

122.    Similarly, the Defendants neglected to disclose any income on their *Chapter 7 Statement of Your Current Monthly Income* for purposes of the chapter 7 means test.

123.    In addition, in their *Schedule J:  Your Expenses* the Debtors disclose that their monthly expenses total $36,428,76, which amounts to approximately $437,000 per year.

BUCHALTER
A Professional Corporation
Los Angeles

**COMPLAINT**

124.    This begs the question how the Defendants, who earned $416,000 in 2016, $280,000 in 2017 and who have $437,000 in annualized expenses, only own personal property assets valued at $2,500.00.

125.    A closer look at *Schedule A/B:  Property* reveals only $500.00 of miscellaneous electronics, $1,000.00 of personal clothing, $1,000 in miscellaneous jewelry and $0.00 in furniture (alleging that "[t]he furniture in debtors' home belongs to his children.").

126.    The Defendants shockingly claim they have only $2,500.00 in personal property assets despite living in a $6.156 million home (as scheduled by the Defendants) to $10 million home (as appraised by the Plaintiff).

127.    More significantly, it is unfortunate that in an effort to avoid their obligations to pay on the Judgment and to hide assets and funds from the Receiver, the Defendants are willing to allow their son, Karim Karawia, to perjure himself.

128.    In Karim Karawia's declaration in support of his *Third Party Karim Karawia's Ex Parte Application for Leave to Appear and Move for Relief and for an Order that His Personal Account is Not Receivership Property*, he states that the $12 million house at 12678 Mountain Crest Lane, Los Angeles California is his "personal residence," that he is not "holding funds [in the account at issue at Bank of America] for the benefit of Defendants in this action," and that the funds in the "account are used for [Karim's] personal and living expenses."

129.    Each of these statements is untrue, and is demonstrated by the complete bank records in the possession of the Receiver.  Moreover, with respect to the residence, as reflected on the New Account bank records, Karim Karawia's address is 3354 Palo Vista Dr., Rancho Palos Verdes, CA 90275.  This is the house of his mother and Sam Karawia's ex-wife, Sherine M. Assal, who also owns AGS.  This address is also reflected as Karim Karawia's residence on his Security Guard Licensing Detail and his alumni online information for Loyola Marymount University.

130.    Additionally, the Defendants testified at their 341(a) meeting of creditors that they do not own any vehicles, which is consistent with their Schedule A/B:  Your Property.  They

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

1   further testified that they "borrow" vehicles from their children.  Yet, Sam Karawia has an auto

2   insurance policy for a Ferrari that he previously owned and that purportedly transferred to AGS.

3       131.   Specifically, in October 2012, Sam Karawia transferred title ownership to the 1997

4   Ferrari F355 to S & S Management Services, LLC, a California limited liability company, which

5   is owned by Sherine and Sherif Assal.  However, Sam Karawia continues to pay for the auto

6   insurance on the Ferrari and the Defendants are the only listed drivers on the policy.

7                                          **IV.**

8                              **FIRST CLAIM FOR RELIEF**

9       **[Against the Defendants for Objection to Discharge Pursuant
10      to 11 U.S.C. § 727(a)(2):  Transfer and Concealment of Assets]**

11      132.   The Plaintiff incorporates by reference and reasserts each of the allegations set

12  forth in paragraphs 1 through 131, inclusive, as though set forth in full.

13      133.   The Defendants, with intent to hinder, delay, or defraud the Plaintiff has

14  transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred,

15  removed, destroyed, mutilated or concealed, property of the Defendants within one year prior to

16  the Petition Date.

17      134.   As set forth in Paragraphs 1 through 131, *supra*, the Defendants have gone to great

18  lengths to render themselves judgment proof by transferring, concealing assets and hiding

19  income.

20      135.   Based on these allegations, the Plaintiff requests that this Bankruptcy Court enter

21  judgment denying the Defendants' discharge under section 727(a)(2) of the Bankruptcy Code.

22                                          **V.**

23                            **SECOND CLAIM FOR RELIEF**

24      **[Against the Defendants for Objection to Discharge Pursuant
25      to 11 U.S.C. § 727(a)(3):  Failure to Maintain Records]**

26      136.   The Plaintiff incorporates by reference and reasserts each of the allegations set

27  forth in paragraphs 1 through 135, inclusive, as though set forth in full.

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 33681044V2

23

**COMPLAINT**

137.    As set forth in Paragraphs 1 through 131, *supra*, the Defendants have gone to great lengths to render themselves judgment proof by transferring, concealing assets and hiding income.

138.    The Defendant has failed to provide sufficient records and documentation to the Plaintiff in connection with the post-judgment discovery with respect to the Defendants' business affairs, the diminution of the Defendants' assets, and records to permit the Plaintiff to ascertain the full scope of the Defendants' assets and sources of income.

139.    The Plaintiff is informed and believes, and thereupon alleges, that the Defendants have concealed, destroyed, or failed to keep or preserve recorded information, including books and records regarding their transactions pertaining to their business affairs and other assets.  The Defendants have no justification for such failure to keep and preserve such information.

140.    The Plaintiff is formed and believes, and based thereupon alleges, that the Defendants, with intent to hinder, delay, or defraud a creditor, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed (A) property of the debtor, within one year before the date of the filing of the petition, or (B) property of the estate, after the date of the filing of the petition.

141.    Based on these allegations, the Plaintiff requests that this Bankruptcy Court enter judgment denying the Defendants' discharge under section 727(a)(3) of the Bankruptcy Code.

## VI.

## **THIRD CLAIM FOR RELIEF**

### **[Against the Defendants for Objection to Discharge Pursuant to 11 U.S.C. § 727(a)(4):  False Oath]**

142.    The Plaintiff incorporates by reference and reasserts each of the allegations set forth in paragraphs 1 through 141, inclusive, as though set forth in full.

143.    The Defendants signed the *Declaration Concerning Debtor's Schedules* attesting under penalty of perjury that all of the information contained within the schedules was complete and accurate.  The Defendants' initial Schedule A/B show assets valued at only $2,500.00.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

144.    As set forth in Paragraphs 1 through 131, *supra*, the Defendants have gone to great lengths to render themselves judgment proof by transferring, concealing assets and hiding income.

145.    The Plaintiff is informed and believes, and thereupon alleges, that the Defendants knowingly and fraudulently, in or in connection with this case, made a false oath or account in his bankruptcy papers as follows:

    a.    Failing to disclose or truthfully account for all assets and all liabilities, including but not limited to monies that were borrowed by or gifted to the Defendants;

    b.    Failing to disclose their true employment history;

    c.    Failing to disclose the true nature and scope of their assets;

    d.    Failing to disclose the true nature and scope of their current income and income for the past three years; and

    e.    Failing to disclose their true expenses.

146.    Based on these allegations, the Plaintiff requests that this Bankruptcy Court enter judgment denying the Defendants' discharge under section 727(a)(4) of the Bankruptcy Code.

## VII.

## <u>FOURTH CLAIM FOR RELIEF</u>

**[Against the Defendants for Objection to Discharge Pursuant
to 11 U.S.C. § 727(a)(5):  Loss and Deficiency of Assets]**

147.    The Plaintiff incorporates by reference and reasserts each of the allegations set forth in paragraphs 1 through 146, inclusive, as though set forth in full.

148.    The Defendants require nearly $35,000 per month to maintain their lavish lifestyle. The Defendants have scheduled no income and a *de minimis* amount of personal property assets considering that they live in a $10 million mansion in the Mountaingate community.

149.    As set forth in Paragraphs 1 through 131, *supra*, the Defendants have gone to great lengths to render themselves judgment proof by transferring, concealing assets and hiding income.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

25

**COMPLAINT**

150.   The Defendants have failed to explain satisfactorily any loss of assets or deficiency of assets to meet the Defendants' liabilities.

151.   Based on these allegations, the Plaintiff requests that this Bankruptcy Court enter judgment denying the Debtor's discharge under section 727(a)(5) of the Bankruptcy Code.

## VIII.

## FIFTH CLAIM FOR RELIEF

**[Against the Defendants for Determination of Nondischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A):  False Representations or Fraud]**

152.   The Plaintiff incorporates by reference and reasserts each of the allegations set forth in paragraphs 1 through 151, inclusive, as though set forth in full.

153.   As set forth in Paragraphs 1 through 131, *supra*, the Defendants have gone to great lengths to render themselves judgment proof by transferring, concealing assets and hiding income.

154.   The Defendants took actions that had the effect of shielding their assets from creditors, including Plaintiff.

155.   The Defendants' actions to shield their assets from creditors, evidence an intention to deceive the Plaintiff so that the Defendants could avoid having to pay any of their obligations owing to the Plaintiff.

156.   As a proximate cause of the Defendants' false representations, the Plaintiff sustained damages in excess of $4 million, and the Plaintiff has incurred significant costs and attorneys' fees in attempting to collect said sum, which will be shown according to proof at the time of trial.

157.   Based on the allegations as alleged herein, the Plaintiff requests a determination by this Bankruptcy Court that the award for damages, punitive damages and any and all other claims, debts and damages by the Defendants to the Plaintiff arising from or relating to the allegations herein are not dischargeable pursuant to Sections 523(a)(2)(A) of the Bankruptcy Code.

BUCHALTER
A Professional Corporation
Los Angeles

**COMPLAINT**

# IX.

## SIXTH CLAIM FOR RELIEF

**[Against the Defendants for Determination of Nondischargeability of Debt
Pursuant to 11 U.S.C. § 523(a)(2)(B):  False Statements in Writings ]**

158.    The Plaintiff incorporates by reference and reasserts each of the allegations set forth in paragraphs 1 through 157, inclusive, as though set forth in full.

159.    As set forth in Paragraphs 1 through 131, *supra*, the Defendants have gone to great lengths to render themselves judgment proof by transferring, concealing assets and hiding income.

160.    The Defendants knowingly made statements in writing that were materially false, respecting the Defendants financial condition, in connection with the Judgment upon which the Plaintiff reasonably relied.

161.    As a proximate cause of the Defendants' false representations, the Plaintiff sustained damages, and the Plaintiff has incurred significant costs and attorneys' fees in attempting to collect said sum, which will be shown according to proof at the time of trial.

162.    Based on the allegations as alleged herein, the Plaintiff requests a determination by this Bankruptcy Court that the award for damages, punitive damages and any and all other claims, debts and damages by the Defendants to the Plaintiff arising from or relating to the allegations herein are not dischargeable pursuant to Section 523(a)(2)(B) of the Bankruptcy Code.

# X.

## SEVENTH CLAIM FOR RELIEF

**[Against the Debtor for Determination of Nondischargeability of Debt Pursuant to
11 U.S.C. § 523(a)(4):  Fraud or Defalcation While Acting in a Fiduciary Capacity]**

163.    The Plaintiff incorporates by reference and reasserts each of the allegations set forth in paragraphs 1 through 162, inclusive, as though set forth in full.

164.    As set forth in Paragraphs 1 through 131, *supra*, the Defendants have gone to great lengths to render themselves judgment proof by transferring, concealing assets and hiding income.

**BUCHALTER**
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

165.    The Defendants effectuated a fraudulent scheme by transferring all of their personal assets out of the reach of creditors by shielding them.  This fraudulent scheme impaired the Plaintiff's ability to realize the underlying loans and Judgments.

166.    The Defendants were insolvent at the time that assets were transferred out of the reach of their creditors.  As a result, the Defendants owed a fiduciary duty to their creditors.

167.    As a proximate cause of the Defendants' conduct, the Plaintiff sustained damages, and the Plaintiff has incurred significant costs and attorneys' fees in collecting said sum, which will be shown according to proof at the time of trial.

168.    Based on the allegations as alleged herein, the Plaintiff requests a determination by this Bankruptcy Court that the award for damages, punitive damages and any and all other claims, debts and damages by the Defendants to the Plaintiff arising from or relating to the allegations herein are not dischargeable pursuant to Section 523(a)(4) of the Bankruptcy Code.

## XI.

### EIGHTH CLAIM FOR RELIEF

169.    The Plaintiff incorporates by reference and reasserts each of the allegations set forth in paragraphs 1 through 168, inclusive, as though set forth in full.

170.    The Defendants effectuated a fraudulent scheme by transferring all of their personal assets out of the reach of creditors by shielding them.  This fraudulent scheme impaired the Plaintiff's ability to realize the underlying loans and Judgments.

171.    The Defendants willfully and maliciously injured the Plaintiff, and the Defendants' actions were committed with knowledge that harm to the Plaintiff was substantially certain.

172.    No just cause or excuse exists for the Defendants' actions.

173.    As a proximate cause of the Defendants' conduct, the Plaintiff sustained damages, and the Plaintiff has incurred significant costs and attorneys' fees in collecting said sum, which will be shown according to proof at the time of trial.

174.    Based on the allegations as alleged herein, the Plaintiff requests a determination by this Bankruptcy Court that the award for damages, punitive damages and any and all other claims,

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

1  debts and damages by the Defendants to the Plaintiff arising from or relating to the allegations

2  herein are not dischargeable pursuant to Section 523(a)(6) of the Bankruptcy Code.

3         **WHEREFORE, the Plaintiff prays that the Court enter judgment as follows:**

4         1.     That the Defendant be denied a discharge pursuant to Sections 727(a) of the

5  Bankruptcy Code;

6         2.     That the obligations of the Defendants, and any and all other claims, debts and

7  damages owed by the Defendants to the Plaintiff arising from or relating to the allegations herein

8  are not dischargeable pursuant to either Sections 523(a)(2), (a)(4), or (a)(6) of the Bankruptcy

9  Code;

10        3.     For actual damages in an amount not less than $4 million, plus accrued interest,

11  attorneys' fees and costs, the sum of which will be shown according to proof at the time of trial,

12  as against the Defendants;

13        4.     For punitive damages arising from the Defendants' willful and wanton conduct,

14  the sum of which will be shown according to proof at the time of trial, as against the Defendants;

15        5.     For attorneys' fees and costs of suit incurred in prosecuting this Complaint; and

16        6.     For such other and further relief as the Court deems just and proper.

17  DATED:  August 3, 2018                    BUCHALTER, A Professional Corporation

18

19                                           By:    _/s/ Anthony J. Napolitano_____

20                                                  ANTHONY J. NAPOLITANO

21                                           Attorneys for Plaintiff
                                             ZB, N.A. D/B/A CALIFORNIA BANK & TRUST

22

23

24

25

26

27

28
BN 33681044V2                                29

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES